## GRAHAM GRAPHICS, INC., APPELLEE, V. BAER MARKETING INTERNATIONAL, INC., APPELLANT.

631 N.W. 2d 550

Filed July 24, 2001.   No. A-00-585.

Jeffrey A. Silver for appellant.

David W. Watermeier and Kelly N. Tollefsen, of Morrow, Poppe, Otte, Watermeier & Phillips, P.C., for appellee.

HANNON, INBODY, and MOORE, Judges.

HANNON, Judge.

### INTRODUCTION

Baer Marketing International, Inc. (Baer Marketing), appeals a judgment against it and in favor of Graham Graphics, Inc. (Graham Graphics), for the remaining balance of a debt incurred for certain printing services for Cris Anne's, a dried flower store. Baer Marketing alleges the trial court erred in finding that it was responsible for the debt rather than another company known as Baer Imports, Inc. (Baer Imports), which Baer

Marketing argued was Cris Anne's parent corporation and the proper defendant in this case. We find that the evidence supports the trial court's conclusion because Baer Marketing continued Baer Imports' management and control of Cris Anne's such that recognizing the corporate entities would be an injustice and that therefore it is responsible for the bill to Graham Graphics. Accordingly, we affirm.

## BACKGROUND

This lawsuit stems from six orders made by Cris Anne's for printing work done by Graham Graphics. The gravamen of the dispute centers on which company is responsible for the printing debt. Cris Anne's ordered certain printing and other work to be done by Graham Graphics on six separate occasions. Each occasion was marked by an invoice, which were all received into evidence. Each invoice is addressed to "Baer Imports/Cris Anne's, Jeff Rall, 4700 Douglas Circle, Lincoln, NE, 68504," and bears the same customer number—0001412. The dates and amounts of the invoices are as follows: July 10, 1996: $9,235.17; July 20, 1996: $504.81; August 3, 1996: $246.80; August 24, 1996: $582.17; August 29, 1996: $6,979.71; and September 4, 1996: $16.51. The record also includes several statements on the account which present the various charges listed above as well as payments and interest accrued on the outstanding balance. The most recent statement is dated April 23, 1997. This statement shows that seven payments were made on the account. The dates and amounts of those payments are as follows: October 8, 1996: $1,000; October 16, 1996: $1,000; October 25, 1996: $1,000; October 30, 1996: $500; November 5, 1996: $1,000; November 20, 1996: $1,000; and December 4, 1996: $500.

Copies of the checks written for the first two of these seven payments were also received into evidence. The checks were drawn on an account for Baer Marketing, which had an address which matched the address for Baer Imports/Cris Anne's as shown on the invoices and statements from Graham Graphics. Further, the customer identification number written on the memorandum line of the checks matched the customer identification number on the invoices and statements. The record does not

contain further documentary evidence as to who made the other five payments or on which account they were drawn. However, Jerry Peed, the general manager in 1996 for Baer Marketing, testified that he and Jeff Rall, another manager for Baer Marketing, were given Baer Marketing checks with which to pay all of Cris Anne's bills. Peed testified that they used the checks and account accordingly, and this evidence supports the conclusion that the other five payments were also paid using the Baer Marketing account. Graham Graphics received no further payments after December 4, 1996, and subsequently brought this suit against Baer Marketing for the remaining balance. Graham Graphics' petition alleged that Baer Marketing had done business under the name "Cris Anne's" at the address referenced above as being on the invoices, statements, and checks. The petition further alleged that Baer Marketing had requested the printing services described above but failed to pay the remaining balance owed for those services. Accordingly, Graham Graphics prayed for judgment against Baer Marketing for the remaining balance, $11,565.17, plus interest and costs of the action.

Baer Marketing's answer denied each and every allegation in Graham Graphics' petition and further alleged that Graham Graphics' suit was frivolous and brought in an attempt to harass Baer Marketing. Accordingly, Baer Marketing prayed for the court to dismiss the petition with cause and for sanctions and attorney fees. Trial on the matter occurred on February 1, 2000. The testimony presented was as follows:

Peed sold Cris Anne's to Baer Imports in 1993. Peed was then hired as Cris Anne's manager from 1993 to 1996. Baer Imports was incorporated under the laws of Nebraska in 1990. Its articles of incorporation listed its home office at 1650 Farnam Street, Omaha, Nebraska, 68102. Baer Imports was owned by Alan Baer and Associates (ABA), a company whose major stockholder was Alan Baer. Baer was not available to testify at trial, so his March 18, 1998, deposition was received into evidence. Baer testified that ABA was the parent company to several smaller companies and that one payroll company handled all of ABA's companies.

Baer testified that ABA owned most of Baer Imports, which was no longer in existence. Also according to Baer, Baer

Imports was the umbrella company for Cris Anne's and controlled it accordingly. Peed was hired as the manager and was given authority from ABA to order supplies and pay bills on behalf of Cris Anne's. ABA and Baer also own most of Baer Marketing. Baer further testified that if a company was unprofitable, then the umbrella company would be called on to pay its bills, but he referred to ABA as the umbrella company when making this statement. Baer also stated that Rall and Peed had authority to write checks on Baer Marketing's account to pay for Cris Anne's bills, and he assumed Peed was employed by Baer Marketing. However, when asked whether ABA was responsible for bills of Baer Imports, Cris Anne's, and Baer Marketing, Baer's attorney instructed him not to answer.

Peed testified that he worked for Baer Marketing for approximately 3 years as Cris Anne's manager, but on cross-examination, he admitted that he was not sure which company he worked for because he did not know the difference between Baer Imports and Baer Marketing. Peed testified that Baer Marketing ran Cris Anne's; that if Cris Anne's needed cash, ABA provided it; that ABA did all of the accounting for Cris Anne's; and that one payroll agency handled all of ABA's companies. When pressed further, Peed stated he was not aware of a difference between Baer Imports/Cris Anne's and Baer Marketing/Cris Anne's. With respect to the invoices, Peed testified that he made the orders reflected therein approximately 30 to 60 days before the date of the invoices. For use in making payments, Peed testified that he was provided a Baer Marketing checking account and had authority to use that account for Cris Anne's bills. In fact, Peed testified that all of Cris Anne's bills were paid on Baer Marketing's account.

Baer Marketing offered into evidence a certificate from the Nebraska Secretary of State's office which stated that Baer Marketing was incorporated on July 18, 1996. This date falls between the dates of the first and second invoices referenced above. Peed explained that the business was restructured in July 1996. It was at that time that he received new checks for Cris Anne's which were drawn on a Baer Marketing account, but he still took his directions from the nucleus of individuals at ABA. After this restructuring, Peed used the Baer Marketing checking

account to pay all debts owed to Cris Anne's vendors. He further stated that all of the Baer companies ran together, but he had only Baer Marketing's checking account to pay Cris Anne's bills.

Finally, Scott Stewart, president of Graham Graphics, testified. He stated that he thought he was doing business with Baer and his companies. He further testified that he has had difficulty in collecting the balance on which this suit was based.

The trial court entered its order on May 17, 2000. The trial court found that Cris Anne's was operated as a subsidiary business of Baer Imports until July 17, 1996, after which time Cris Anne's was operated as a subsidiary business of Baer Marketing. The trial court held that Baer Marketing "was the successor in interest to the business known as 'Cris Anne's' from and after July 18, 1996." The trial court concluded that Baer Marketing recognized its obligation as the successor in interest to pay the bill by paying at least $2,000 on it already. It also specifically found that Graham Graphics was led to believe that Baer Marketing would pay the bill and that it had rendered services based on that belief. Accordingly, the court entered judgment against Baer Marketing for $11,565.17 plus $6,575.98 in interest.

Baer Marketing subsequently perfected this appeal.

## ASSIGNMENT OF ERROR

Baer Marketing alleges, restated, that the trial court erred in finding that it owed the remaining balance of Cris Anne's unpaid bill from Graham Graphics.

## STANDARD OF REVIEW

"In an appellate review of a bench trial in a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong." *Blue Creek Farm v. Aurora Co-op Elev. Co.*, 259 Neb. 1032, 1036, 614 N.W.2d 310, 313 (2000).

When reviewing a judgment awarded in a bench trial, an appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

*Folgers Architects v. Kerns*, 9 Neb. App. 406, 415, 612 N.W.2d 539, 547 (2000).

## ANALYSIS

Baer Marketing has consistently maintained throughout this action that it is the wrong entity to be sued over this debt and that the correct defendant should have been Baer Imports. Baer Marketing does not dispute the amount of the bill or that it is fair and reasonable for the goods and services provided. It argues only that it could not be responsible for the bill because it did not come into existence until after the date of the first invoice. It also argues that it was not connected to Cris Anne's so as to incur any liability on the bill.

■ Generally, "a corporation will be looked upon as a separate legal entity until sufficient reason to the contrary appears." *Hayes v. Sanitary & Improvement Dist. No. 194*, 196 Neb. 653, 663, 244 N.W.2d 505, 511 (1976). In cases where there is sufficient evidence in the record to pierce the corporate veil and dissipate the separate legal identities, "the law has no compunction in holding a corporation liable for the acts of its owner or vice versa." *Id.* "In equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice." *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 135, 296 N.W.2d 474, 477 (1980). See, also, *In re Application of CN Carriers, Inc.*, 1 Neb. App. 1151, 510 N.W.2d 545 (1993) (quoting this rule in determining subsidiary corporation was merely alter ego of parent corporation).

■ In *Hayes*, a Nebraska corporation was a wholly owned subsidiary of a Minnesota corporation. The Nebraska employees were paid from the payroll of the Minnesota corporation, then the Nebraska corporation reimbursed the Minnesota corporation. Further, the officers and directors of the two corporations interlocked, even though the corporations maintained separate books and filed separate tax returns. The Nebraska Supreme Court held:

> "[T]he notion of separate corporate existence of parent and subsidiary or affiliated corporations will not be recognized where one corporation is so organized and controlled and

its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation. The fiction of separate corporate identity of two corporations will not be extended to permit one of the corporations to evade its just obligations or to promote fraud or illegality or injustice."

*Hayes*, 196 Neb. at 664, 244 N.W.2d at 511-12. The court in *Hayes* found the evidence before it amply sufficient to support disregarding the separate corporate entities.

In *United States Nat. Bank of Omaha*, the Nebraska Supreme Court found that a corporation was the alter ego of its sole shareholder. The court noted that the corporation operated almost wholly on money from the shareholder. Also, the shareholder diverted assets between this corporation and others in which he had an interest for his own personal benefit. The shareholder also permitted obligations incurred by one corporation to be paid by another. Given these facts, the court found that the shareholder had operated without regard to the separate corporate entities and that therefore debts incurred by the corporation were, in legal contemplation, already the shareholder's debts as well.

In *Global Credit Servs. v. AMISUB*, 244 Neb. 681, 687, 508 N.W.2d 836, 842 (1993), the Nebraska Supreme Court explained: "To pierce the corporate veil between a parent and a subsidiary, a plaintiff must show more than the mere sharing of services between the two corporations." The court in *Global Credit Servs.* cited to a Georgia case in which the appellate court refused to pierce the corporate veil between a parent and subsidiary corporation despite that they shared some officers, that they had jointly purchased property, and that some of the subsidiary's officers were paid by the parent. In *Global Credit Servs.*, the court also noted that particularly important in the Georgia case was the fact that the subsidiary was fully capitalized and insured, owned the hospital property it operated, autonomously managed and operated its business on a day-to-day basis, maintained its own payroll, and employed its own employees. The court in *Global Credit Servs.* denied piercing the corporate veil in the case before it because the mere fact that the subsidiary was wholly owned by the parent and that the parent stood behind a debt of the subsidiary was insufficient to

prove that the subsidiary was totally dominated by the parent to justify such relief.

We believe the record supports finding that Cris Anne's was a subsidiary of Baer Imports until the restructuring in July 1996, at which time Cris Anne's became the subsidiary of Baer Marketing. Both Baer Imports and Baer Marketing were in turn subsidiaries of ABA. Peed testified that at the time of the restructure, he was given authority to pay Cris Anne's debts on a Baer Marketing account and further that when Cris Anne's needed money, it looked to its parent company, ABA. The restructure of the control and management of Cris Anne's from Baer Imports to Baer Marketing presented in the record supports a conclusion that Baer Marketing merely continued and controlled Cris Anne's business as it was under Baer Imports. The business remained unchanged using the same name, management employees, and address. According to Baer himself, Baer Imports ceased existing once Baer Marketing was created, and Baer Marketing was created, at least in part, to take over and continue Cris Anne's, which it did for some time before Cris Anne's ceased its operations. Further, the same company and same nucleus of individuals controlled Baer Imports and Baer Marketing. The address on Baer Marketing's checks matched the one on the invoices under the name Baer Imports/Cris Anne's. These facts, taken together in the backdrop of all of the evidence presented and the above-cited authority, supports the finding that Baer Marketing is liable for the debt incurred by Cris Anne's. The corporations were so closely tied and the management and financing so commingled that following the corporate form as Baer Marketing suggests would lead to injustice.

Baer Marketing also argues vehemently that it was not yet in existence when the contract for printing services and certain reliances for payment were made and so it could not be held accountable for this bill. In *Stolmeier v. Beck*, 232 Neb. 705, 709, 441 N.W.2d 888, 891 (1989), the Nebraska Supreme Court stated that "a contract made by a promoter for a corporation [not yet in existence] may be adopted by the corporation after it comes into existence."

> This adoption may be by express corporate action, or it
> may be established by implication from the conduct of the

corporation. Particularly pertinent to this action, where the corporation voluntarily accepts the benefits accruing to it from the engagement of its promoters, after full knowledge and having the opportunity to decline the same, it is to be regarded as adopting the contract.

*Id.* Using this rule, the court found that a corporation which, through its officers, had notice of money solicited for use by the corporation and was then used by the corporation in operating its business had adopted the burdens and benefits of the agreement from which the money was invested. Accordingly, the corporation could be properly held liable for a breach of that agreement. Under this authority, we find that Baer Marketing's assertion that Baer Marketing could not be held liable for the printing work simply because Baer Marketing did not come into existence until after the contract was made cannot prevail.

## CONCLUSION

For the reasons stated, we affirm the trial court's order.

AFFIRMED.